UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

**ONE WORLD, LLC** & **GABRIEL CHALEPLIS**,

                                    Plaintiffs,

   -against-                                                     No. 20 Civ. 5802 (CM)

**NIKOLAOS ONOUFRIADIS**, et al.,

                                    Defendants.

---

## MEMORANDUM ORDER AND DECISION

McMahon, C.J.:

Plaintiffs, One World, LLC, and Gabriel Chaleplis, the sole member of One World, bring this action against Defendants Nikolaos Onoufriadis, James M. Rodgers, Esq., Michael Karloutsos, and Canncore, Inc.  Plaintiffs allege that Defendants induced Chaleplis to invest €10,750,000 (approximately $12,000,000) of One World's funds in Greek companies controlled by associates of Defendants, who then rerouted the funds back into themselves in the United States and used them for personal purposes.  The First Amended Complaint, filed on October 16, 2020 (Dkt. No. 33, "Compl."), includes thirteen counts brought under state common law and two counts arising under the Racketeering and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968.

Defendant Karloutsos now moves to dismiss all claims brought against him.  Defendants Canncore and Onoufriadis move to dismiss only the two counts alleging violations of RICO.  And Plaintiffs, in opposing both motions, seek leave to amend their complaint a second time.

1

For the reasons discussed below, the motions to dismiss Plaintiffs' RICO claims are GRANTED, and the court *sua sponte* dismisses the RICO claim against non-moving defendant James Rodgers as well. The motion for leave to replead those claims is denied as futile.

The RICO claims are the only basis for invoking federal jurisdiction. There does not exist complete diversity among the parties – a fact that was originally misrepresented to the court, and was not corrected until last week, three months after Plaintiffs filed their amended complaint and while the fully-briefed motions to dismiss were *sub judice*.  A New York federal court, located in a jurisdiction where no party resides or does business and which has no particular interest in this controversy, is disinclined to exercise supplemental jurisdiction over the thirteen common law counts, especially as this case is far from ready for dispositive motions or trial. I thus dismiss them as against all defendants without prejudice. Karloutsos's motion to dismiss the state law claims on substantive grounds is denied as moot in light of the Court's decision not to exercise supplemental jurisdiction.

As further amendment of Plaintiffs' claims in this action cannot cure the jurisdictional defect, Plaintiffs' motion for leave to amend their common law claims is DENIED, albeit without prejudice to whatever changes Plaintiffs may wish to make to their pleading in a court of competent jurisdiction.

**BACKGROUND**

*A. Parties*

**Plaintiffs.**  Gabriel Chaleplis is a wealthy Greek national and a citizen of the United Kingdom residing in London.  (Compl. ¶ 5; Dkt. No. 37 at 1.)  Chaleplis formed One World, a limited liability company, to serve as his investment vehicle in May 2017.  (*Id*. ¶ 33.) One World is registered in Wilmington, Delaware.  (*Id*. ¶ 5.)  At the time this lawsuit was filed, Chaleplis was the sole member of One World.

2

**Defendants.**   As the court learned only last week, Nikolaos Onoufriadis is a citizen of Greece and a lawful permanent resident of the United States, who lives and works in Massachusetts. He is the former Manager of One World and former 20% member of One World. (*Id*. ¶ 6; Dkt. No. 67 at 1.)

James Rodgers is a licensed attorney and a resident of the State of Pennsylvania.  Rodgers is the former Secretary and Chief Legal Officer of One World.  (*Id*. ¶ 7.)

Michael Karloutsos resides in Virginia. He never held any formal position at One World. Karloutsos, who ran a high-end restaurant in Philadelphia called Water Works, was the Deputy Chief of Protocol at the State Department from July 23, 2017 until December 17, 2017, making him responsible for planning foreign trips for the President and Vice President. According to press reports, he filled a similar role for a patriarch of the Greek Orthodox Church.[1]  (*Id*. ¶¶ 8, 29, 62.)

Canncore, Inc. is incorporated in the State of Massachusetts, where it also has its principal place of business.  (*Id*. ¶ 9.)   According to Canncore's website, it has additional offices in New York and Greece.  (*Id*. ¶ 163.)  Onoufriadis formed Canncore on October 14, 2019.  (*Id*. ¶ 166.)

*B.  Formation of One World*

In May 2017, Chaleplis sought to form a company to serve as a vehicle through which he could invest in American businesses.  (*Id*. ¶ 33.)  He consulted with Nikolaos Onoufriadis, a businessman with whom Chaleplis shared a mutual friend in Greece.  (*Id.* ¶ 11.)

Through his websites and in a series of conversations that took place "before May 27, 2017, before September 30, 2017 and after both of those dates," Onoufriadis offered Chaleplis consulting services through his company Power 2U. Onoufriadis represented that he was experienced in

---

[1] *How a Top Philly Restaurant Owner Landed a Top State Department Job*, Philadelphia Inquirer, August 11, 2017 (https://www.inquirer.com/philly/news/politics/presidential/michael-karloutsos-state-department-protocol-water-works-philadelphia-trump-20170811.html).

international business development and global government relations, and that he was familiar with various American industries and business sectors in which Chaleplis was interested in investing. (*Id.* ¶¶ 12-21.)  In particular, Onoufriadis indicated that he had a business relationship with a Greek billionaire whose company, Intrasoft International, held business interests in the same industries in which Chaleplis wished to invest in the United States.  (*Id.* ¶ 23.)  The complaint alleges that Chaleplis relied on these representations when deciding to enlist Onoufriadis for the management of his bourgeoning company. (*Id.* ¶ 22-23.)

Onoufriadis recommended that Chaleplis bring on Michael Karloutsos, Onoufriadis's close friend, for his purported expertise in American and Greek business, public relations, governmental relations, and lobbying.  (*Id.* ¶¶ 25-26.)  Onoufriadis, Karloutsos, and Chaleplis then met in Greece to discuss what their respective roles in the company would be.  (*Id.* ¶ 27.)  In the communications that followed, Karloutsos recommended that Chaleplis engage James Rodgers, his friend and a lawyer, to handle the necessary legal work.  (*Id.* ¶¶ 28, 31.)

Chaleplis formed One World on or around May 24, 2017.  (*Id.* ¶ 33.)  Four months later, on September 28, the four men met in Manhattan to discuss investment strategy and to negotiate contract terms and other matters concerning the roles that Onoufriadis, Rodgers, and Karloutsos were to play in this new business venture.  (*Id.* ¶¶ 34-35.)

During that meeting, Onoufriadis, Karloutsos, and Rodgers assured Chaleplis that they had the requisite professional relationships, knowledge, and experience to successfully identify and pursue investments on behalf of Chaleplis and One World.  (*Id.* ¶¶ 36-40.)  On the basis of those representations, Chaleplis hired Onoufriadis as Manager and Rodgers as Secretary and Chief Legal Officer of One World.  (*Id.* ¶ 41.)  The appointments were memorialized in One World's Operating Agreement, which the parties executed on September 30, 2017.  (*Id.* ¶¶ 51-56.)  Onoufriadis was

given a twenty percent membership interest in One World (though Chaleplis was the "100% profit member"), which he ceded to Chaleplis upon his resignation from One World in April 2020.  (*Id.* ¶¶ 46-49, 196-197.)

At the time, Karloutsos held a position with the U.S. Department of State and so could not formally participate in the management of One World.  Instead, he became a silent contributor to the business; his participation was not mentioned in One World's Operating Agreement.  (*Id.* ¶¶ 29-30, 32, 44.)  The complaint alleges that Karloutsos "utilized his good friends Onoufriadis and Rodgers as 'front men' for Karloutsos to participate in the management, operations, and profitability of One World" and entered into an oral "side agreement" with Rodgers, pursuant to which Rodgers and Karloutsos would split Rodgers's three percent interest in One World 50-50.  (*Id.* ¶¶ 59-61.)  Karloutsos allegedly continued participating in the management and operations of One World after leaving his State Department position on December 17, 2017.  (*Id.* ¶ 62.)

Beginning in November 2017, Chaleplis made numerous capital contributions to One World, which were held in Rodgers's attorney trust account until they could be transferred to one of One World's five bank accounts.  (*Id.* ¶ 63.)  Under One World's Operating Agreement, Onoufriadis had signatory authority over those bank accounts.  (*Id.* ¶¶ 64-65.)

C.  *One World Invests in the Greek Medicinal Cannabis Market*

In a series of discussions and meetings in New York City that took place around March 17, 2018, Karloutsos, Rodgers, and Onoufriadis proposed to Chaleplis that One World invest in the nascent Green medicinal cannabis market.  Although Onoufriadis participated in some of the discussions by phone, he was not physically present at the March 17 meeting.  (*Id.* ¶ 74.))

The plan was for One World to invest a handful of Greek entities, including Conmave Monoprosopi IKE ("Conmave"), which was controlled by Onoufriadis's brother Theophylos, and BioProcann.  (*Id.* ¶¶ 95, 102, 103, 108.)  One World was to advance the funds necessary for the

companies to develop a medicinal cannabis business, including to (i) apply for the licenses and permits needed to create a medical cannabis business, (ii) pay lobbying, governmental, and other service fees for obtaining the necessary licenses, (iii) purchase land and cultivation equipment, and (iv) any other infrastructure and services that would be needed to operate a vertically integrated medicinal cannabis business under Greek law.  (*Id.* ¶¶ 70-72.)   Karloutsos, Rodgers, and Onoufriadis presented Chaleplis with a budget that ostensibly itemized the estimated cost (in millions) for establishing the business.  (*Id.* ¶ 75.)  In exchange for providing funding, One World was supposed to receive an equity interest in Conmave.  (*Id.* ¶ 124.)

Additional meetings followed.  Chaleplis and Onoufriadis met in New York City on March 21, 2018 to discuss further the details of One World's upcoming investment, and Chaleplis, Onoufriadis, and Rodgers met seven months later, on October 14, to provide Chaleplis with an update on the project.  (*Id.* ¶¶ 87-89, 92-93.)

Chaleplis made numerous additional capital contributions to One World to provide the capital for the medicinal cannabis investment during this time: €500,000 on March 12, 2018; €1,000,000 on March 15, 2018; €2,700,000 on March 19, 2018; €10,400,000 on March 30, 2018; and €2,180,000 on December 21, 2018.   Chaleplis deposited all of these funds into Rodgers's Citizens Bank IOLTA attorney trust account until they could be transferred to One World's accounts.  (*Id.* ¶¶ 77, 90.)  The funds from the pre-December investments were transferred to Conmave in four separate wire transactions: $1,813,945 on May 22, 2018; $1,167,900 on June 18, 2018; $1,693,455 again on June 18, 2018; and $3,746,600 on October 17, 2018.  (*Id.* ¶ 278.)  The total amount transferred for Conmave, ostensibly for investment in the cannabis project, was approximately $8,421,900.

### D. *Defendants Divert One World's Investments Through Conmave and BioProcann*

The complaint alleges that Onoufriadis, Karloutsos, and Rodgers siphoned over $9,000,000 of the funds invested by One World to themselves for personal use, through Conmave and BioProcann, and sought to disguise the transactions by issuing promissory notes promising to replay sums loaned by One World, guaranteed by the two Greek companies.

As early as February 2018, Defendants began wiring funds from Conmave's Greek bank account into Rodgers's trust account, including $50,000 on February 26 and $10,000 on February 27. (*Id.* ¶¶ 95, 98.) The complaint alleges that this $60,000 was distributed among Defendants for their personal use. (*Id.* ¶ 103.)

The complaint alleges that, on October 17, 2018, Defendants diverted an additional $3,746,600 (approximately €3,250,000) of One World's funds by wiring the amount to Conmave's Greek bank accounts, which they then misappropriated for personal use and unrelated business interests. (*Id.* ¶¶ 114-115, 119.)

Defendants allegedly "concealed" these transactions by issuing promissory notes. The complaint alleges that Defendants prepared a fraudulent promissory note on May 18, 2018 for €4,000,000 – the total amount transferred by One World to Conmave during May and June 2018—which described One World as the "lender" and Conmave as the "borrower." The loan was also ostensibly "guaranteed" by Conmave, though the same entity cannot be both borrower and guarantor. (*Id.* ¶ 106; Pl. Mem. of Law in Opp. to Karloutsos Mot. for Discovery Order (Dkt. No. 58), Ex. J.) This note has been in default since May 18, 2020. (*Id.* ¶ 110.) A second promissory note, for €3,250,000, was issued on October 17, 2018. (*Id.* ¶¶ 114-115, 119.) Again, One World was the "lender" and both the "borrower" and the "guarantor" were Conmave. (*Id.* ¶¶ 116-117.)

Conmave has never made any payments on either "loan." (*Id.* ¶ 121.) And while One World put its money into the venture, it never received its promised equity in Conmave. (*Id.* ¶ 124.)

The complaint also alleges that Defendants misappropriated the funds that One World sought to invest in BioProcann. On June 26, 2018, Defendants "loaned" $3,534,900 (approximately €3,000,000) of One World's funds to BioProcann and prepared a promissory note purportedly guaranteed by BioProcann – also the borrower – for €3,000,000. (*Id.* ¶ 127.) This "loan" was not secured by BioProcann's assets (whatever they might be) of by anyone other than the borrower. In essence, it, like the Conmave loan, was an unsecured loan. (*Id.* ¶ 129.) Needless to say, no repayment has been received on this loan, either.

Eventually Chaleplis came to believe that Defendants had "improper motives" for directing One World's funds into Conmave and BioProcann. One World recovered €2,200,000 of the €3,000,000 invested in BioProcann through Greek channels. (*Id.* ¶ 132.) After conducting his own investigation, Chaleplis discovered that Defendants had set up similar "loan" transactions between One World and three other European entities owned or controlled by friends and family of Onoufriadis and Karloutsos: Hellascann, Leadercann, and Conwave. (*Id.* ¶ 136.)

### E. Defendants' Use of Converted Funds

The complaint alleges that Onoufriadis used One World's funds to purchase a luxury home. On May 30, 2019, Onoufriadis closed on a waterfront condominium in Boston for $1,923,000 in cash, with no mortgage financing. He put down the initial deposit in November 2018. (*Id.* ¶¶ 138-139.) Plaintiffs allege that Onoufriadis could not have made this purchase using his own assets. (*Id.* 140-141). Plaintiffs also allege that Onoufriadis stole an additional $487,300, which he labeled as a loan to himself from One World, and used the funds to finance maintenance costs on his condo, taxes, and the purchase of a BMW X6. (*Id.* ¶¶ 151-152.)

The complaint alleges that there was a $300,000 wire transfer from One World to Onoufriadis on November 15, 2018 (*id.* ¶ 278(j)).  The complaint does not allege when Onoufriadis obtained the remaining $487,300.  He allegedly wired $363,000 from One World's bank account to two of his friends – $70,948 to Ioannis Manolakos on March 3, 2018 (*id.* ¶ 278(c)), and $291,925 to Fotios Sinioris in August 2018 (*id.* ¶ 278(h)) – again calling these "loans" to Sinioris and Manolakos, presumably from One World (thought the complaint is less than clear).  Manolakos allegedly used One World's funds toward the purchase of a $405,000 condominium in August 2018.  Plaintiffs do not explain how Sinioris spent the money that One World allegedly "loaned" him, but they note that he is associated with some of the Greek ventures in which One World supposedly invested. Neither man offered any sort of security or guarantee for the "loan" and neither has made any payments thereon.   (*Id.* ¶¶ 156-162.)

Plaintiffs also allege that Karloutsos and Rodgers also used One World money to pay for homes they could not afford.  (*Id.* ¶¶ 176-181, 188-191.)  However, these allegations are more problematic, since plaintiffs admit that both men financed their home purchases with conventional bank mortgage loans:  Karloutsos used conventional mortgage financing to purchase a home in McLean, Virginia for $1,270,000 on September 1, 2018, and Rodgers also used conventional mortgage financing to purchase a townhouse in Philadelphia for $491,000 on November 15, 2018. (*Id.* ¶¶ 173-174, 183-184.)  The complaint alleges in conclusory fashion that neither Karloutsos nor Rodgers would have realized enough from the sale of their previous properties to afford their respective down payments.  (*Id.* ¶¶ 177-178, 189-190.)  But it contains no allegations about Rodgers' finances and no allegations tending to show why an attorney engaged in the practice of law would not be able to afford a modestly priced townhouse, without regard to what he realized from the sale of any previous property. The complaint alleges that Rodgers received a check for

$18,198 from One World on March 25, 2019, for "business development expenses" incurred between January 2018 and March 2019 (*id.* ¶ 191.), which is not inconsistent with the allegation that he was retained to do legal work in connection with the business development project.

As for Karloutsos's finances, Plaintiffs allege that he took out a sizable business loan in 2006 so that he could operate his restaurant in Philadelphia.  But there is no allegation that the loan is in default or that it has impacted Karloutsos' credit negatively. They further allege that there is a $36,179 default judgment outstanding against him.  (*Id.* ¶¶ 179-181.)

### F.  Formation of Defendant Canncore, Inc.

On or around October 14, 2019, Onoufriadis formed Canncore, a Massachusetts corporation that is marketed (on its website) as "the leading Greek cannabis company" with licenses to distribute cannabis-related products in Greece and throughout Europe. (*Id.* ¶¶ 163-164, 166.)  According to Canncore's registration, Onoufriadis is the sole officer, director, and agent for Canncore.  (*Id.* ¶ 165.)

Plaintiffs allege that Onoufriadis formed Canncore as a vehicle to control funds misappropriated from One World.

### G.  Onoufriadis Leaves One World

On April 2, 2020, Onoufriadis assigned his 20% ownership interest in One World to Chaleplis, giving the latter 100% of the interest and making him the sole member.  (*Id.* ¶ 196.) Five days later, on April 7, 20120, Onoufriadis resigned from One World.  (*Id.* ¶ 197.)  Prior to Onoufriadis' departure, Chaleplis had become suspicious about his business partners and had begun investigating exactly what was happening with One World's money.  (*Id.* ¶¶ 132, 136.)

### H.  The Instant Lawsuit

On April 20, 2020, Plaintiffs served Onoufriadis with a written notice and demand to (i) return any and all financial and business books that belonged to One World, (ii) account for

$10,000,000 of One World's missing funds, (iii) provide documentary evidence of the various transactions and purported loans referenced above, and (iv) provide all business and due diligence records relating to the transactions and loans.  (*Id.* ¶ 201.)  Onoufriadis did not respond to Plaintiffs' letter or comply with the demands.  (*Id.* ¶¶ 202-203.)

Plaintiffs filed their initial complaint in this court on July 27, 2020.  (Dkt. No. 1.)  On October 16, Plaintiffs filed an amended complaint (Dkt. No. 33), together with a RICO Case Statement, as required by my rules.  (Dkt. No. 34.)

Also in accordance with my rules, (Rule IV.A, Individual Practices and Procedures, McMahon, C.J.), Plaintiffs' counsel filed a letter on October 30, 2020, asserting the bases of jurisdiction alleged by Plaintiffs: claims brought under RICO and the Declaratory Judgment Act and complete diversity.  (Dkt. No. 37.)  Plaintiffs described in detail the bases for their assertion that complete diversity existed. The Court noted in response that the Declaratory Judgment Act does not confer jurisdiction over a federal court.  (Dkt. No. 38; *see Saleh v. Ridge*, 367 F. Supp. 2d 508, 511 (S.D.N.Y. 2005).)  The Court had no way of knowing whether the diversity allegations were true, but no defendant asserted that there was anything amiss about Plaintiffs' claim of diversity – not in response to the letter, and not when the court specifically raised the issue of diversity at the initial pretrial conference, held on November 13, 2020.[2]

The same day that Plaintiffs filed their letter outlining the alleged bases for jurisdiction, October 30, Karloutsos filed a motion to dismiss the amended complaint pursuant to Rule 12(b)(6). (Dkt. No. 39.)  Onoufriadis and Canncore filed a motion to dismiss only the RICO claims on

---

[2] This question often comes up at initial pretrial conferences, since a district court has an obligation to ascertain the basis for its jurisdiction at the earliest possible opportunity. *See Arbaugh v. Y&H*, 546 U.S. 500, 514 (2006). It is particularly pertinent when the only other basis for federal jurisdiction rests on a RICO claim, since those claims are so often dismissed under Rule 12(b)(6). Courts assume that parties are aware of the rules relating to diversity – and, of course, of their citizenship.

November 13 (Dkt. No. 47); Canncore joined in that motion even though the complaint does not identify Canncore as a defendant on the RICO claims. Rodgers elected to file an answer to the complaint rather than make a motion.  (Dkt. No. 41.)

On January 15, 2021 – long after the motions were fully briefed, and while the court was working on its opinion – Onoufriadis filed a letter asserting for the first time that he is a citizen of Greece, and that both he and plaintiff Chaleplis were aliens, although Onoufriadis resides in Massachusetts.  (Dkt. No. 67.)  He argued that, in the event the RICO claims were dismissed, the Court would not have diversity jurisdiction over the pendant state law claims, citing the Second Circuit's decision in *Tagger v. Strauss Grp. Ltd.*, 951 F.3d 124 (2d Cir. 2020), which held that lawful permanent residents are considered aliens for purposes of determining diversity jurisdiction.

## I.  Related Proceedings in Other Courts

Plaintiffs have commenced lawsuits against their venture partners in other courts, both in this country and abroad.

On July 31, Plaintiffs filed a lawsuit in Greece against Conmave and its principals to recover One World's pilfered funds from the actors domiciled in Greece.  (*One World, LLC v. Conmave, et al.*, General Filing No. 52277/2020, Specific Filing No. 5698/2020.)  Plaintiffs were granted a temporary restraining order enjoining the Greek defendants from selling automobiles and boats that they allegedly purchased using the money that was transferred from One World to Conmave.  (Compl. ¶ 214.)

Plaintiffs also filed two memoranda of *lis pendens* for court approval in the District of Massachusetts against Onoufriadis's Boston condo (*One World, LLC v. Onoufriadis*, No. 20-cv-11580-RWZ) and a condo purchased by Manolakos, an associate and alleged co-conspirator of Onoufriadis, Karloutsos, and Rodgers (*One World, LLC v. Manolakos, et. al.*, No. 20-cv-11837).

The court entered orders approving both memoranda on September 2, 2020 and October 9, 2020, respectively.  (Compl. ¶¶ 215-218.)

## DISCUSSION

### I.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570; *Iqbal*, 129 S. Ct. at 1950–51. The Court must accept all factual allegations as true and draw all reasonable inferences in Plaintiff's favor. *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

### II.    RICO Claims

Karloutsos, Onoufriadis, and Canncore move to dismiss Counts XIV and XV, which allege violations of Sections 1962 (a), (b), (c), and (d) of the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968. Since Canncore is not named as a RICO defendant, I will consider this motion as having been made only by the two individuals.

To plead a viable RICO claim, a plaintiff allege that the defendant has violated the substantive RICO statute in "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise,' (7) the activities of which affects interstate or foreign commerce." *Moss v. Morgan Stanley*, 719 F.2d 5, 17 (2d Cir. 1983), *cert. denied*, 465 U.S. 1025 (1984).  A plaintiff must also allege that he was "injured in his business or property by reason of a violation of section 1962." *Id.* (quoting 18 U.S.C. § 1964(c)).

Courts generally approach RICO claims with caution, understanding that Congress's goal in enacting the RICO statute was to prevent legitimate businesses from becoming infiltrated by organized crime, although the statute's reach is not limited to mobsters. *See United States v. Porcelli*, 856 F.2d 1352, 1362 (2d Cir. 1989). "Because the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Schimdt v. Fleet Bank*, 16 F. Supp. 2d 340, 346 (S.D.N.Y. 1998).  RICO claims premised on allegations of mail or wire fraud warrant particular scrutiny, "because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Id.* at 493 (citing *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000)).

### A.  Substantive RICO Violations

Plaintiffs in this case allege that the enterprise consisted of an association-in-fact enterprise consisting of the four Defendants, Sinioris, Manolakos, Conmave, BioProcann, and Onoufriadis's brother Theophylos.  (Rico Case Statement, Dkt. No. 34 at 23.)  They allege violations of all three

of RICO's substantive prohibitions through ten predicate acts of wire fraud, the goal of which was to obtain Plaintiffs' funds wrongfully and for the purpose of using them for personal purposes.[3]

As with any allegation of fraud, the circumstances of the predicate acts of wire fraud must be pled with particularity under Rule 9(b). *Lundy v. Catholic Health Sys. of Long Island, Inc.*, 711 F.3d 106, 119 (2d Cir. 2013). Movants insist that the frauds have not been so pled. However, it is not necessary to delve into whether Plaintiffs have met that requirement – or, for that matter, whether plaintiffs have properly pled the existence of an association-in-fact RICO enterprise. For it is clear that they have failed to plead that the enterprise was run through "a pattern of racketeering activity" or that they suffered RICO injury.

### 1. RICO Pattern

Plaintiffs allege that the association in fact of individuals and corporation that defrauded him carried out its affairs through a "pattern of racketeering activity." The allegation is legally insufficient.

A "pattern of racketeering activity" must consist of consist of at least two predicate acts, "the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). In a civil RICO case like this one, racketeering activities must also "amount to or pose a threat of continued criminal activity." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999) (quoting *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "To meet this so-called 'continuity' requirement, a 'plaintiff in a RICO action must allege either an open-ended pattern of racketeering activity (*i.e.*, past criminal conduct coupled with a threat of future criminal conduct) or a closed-ended pattern of racketeering activity

---

[3] Plaintiffs' RICO case statement alleges violations of the RICO statute "through a pattern of racketeering activity involving wire *and mail* fraud." (Dkt. No. 34 at 2 (emphasis added).) There is no other mention of mail fraud anywhere else in the RICO statement or in the complaint, and Plaintiffs have not identified any use of the mails that could plausibly form the basis of a mail fraud claim.

(*i.e.*, past criminal conduct extending over a substantial period of time." *Grace Int'l Assembly of God v. Festa*, 797 Fed. App'x 603, 605 (2d Cir. 2019) (quoting *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180 (2d Cir. 2004).

In this case, Plaintiffs have alleged neither.

**Closed-ended continuity.**   As noted above, "To satisfy closed-ended continuity, the plaintiff must prove 'a series of predicates extending over a substantial period of time.'" *Cofacredit*, 187 F.3d at 242 (quoting *H.J. Inc.*, 492 U.S. at 242).   The Second Circuit has never found predicate acts spanning less than two years to be sufficient for alleging closed-ended continuity.   *Grace*, 797 Fed. App'x at 605.   Moreover, "while two years may be the *minimum* duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern." *First Capital*, 385 F.3d at 181.   "The court must also consider the number and variety of predicate acts, the presence or absence of multiple schemes, and the number of participants and victims."  *Grace*, 797 Fed. App'x at 605 (citing *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008); *First Capital*, 385 F.3d at 181)).

The acts of wire fraud alleged in Plaintiffs' complaint and in the RICO statement span approximately fifteen months – with the first fraudulent wire transfer occurring on February 26, 2018 and the last sometime around May 2019.[4]  (Compl. ¶¶ 138-39, 145, 151, 278; Dkt. No. 34 at 20-21.)  Plaintiffs are nearly a year shy of the Second Circuit's two-year benchmark.

---

[4] The final predicate act listed by Plaintiffs in their RICO statement and in the RICO section of their complaint occurred on November 15, 2018.  (Compl. ¶ 278; Dkt. No. 34 at 20-21.)  Giving Plaintiffs the benefit of every doubt, the complaint alleges two possible additional predicate acts: a wire transfer from One World to Rodgers on or around March 25, 2019, (Compl. ¶ 191); and another from One World to Onoufriadis in the spring of 2019, around the time that he closed on his condo (Compl. ¶¶ 151-152).

Plaintiffs do not contest that the predicate acts span fewer than two years, but argue instead that Second Circuit precedent leaves room for courts to find closed-ended continuity regardless of the duration of the predicate acts in cases involving complex schemes and numerous acts, perpetrators, and victims. Even if I were to accept Plaintiffs' invitation to reconsider clear Circuit guidance, the allegations in this case would not warrant any deviation. In the handful of district court cases cited by Plaintiffs for the proposition that closed ended continuity can be satisfied by a shorter course of conduct, *see MTC Elec. Techs. S'holder Litig.*, 74 F. Supp. 2d 276 (E.D.N.Y. 1999); *First Interregional Advisors Corp. v. Wolff*, 956 F. Supp. 480 (S.D.N.Y. 1997); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 728 F. Supp. 926 (S.D.N.Y. 1989), the activity alleged was "unusually complex." In this case, the activity was not complex at all. *See Bangladesh Bank v. Rizal Comm. Banking. Corp.*, No. 19 Civ. 983 (LGS), 2020 WL 1322275 (S.D.N.Y. Mar. 20, 2020); *see also Grace*, 797 Fed. App'x at 606; *GICC Capital Corp. v. Tech. Finance Grp., Inc.*, 67 F.3d 463, 468 (2d Cir. 1995). The alleged scheme was a focused and cohesive effort by a handful of people, using corporations they controlled, to obtain money from Chaleplis over a period of far less than two years, under the false pretense that  the money was being invested in legitimate business ventures. In this Court's opinion, that conduct does not add up to the sort of "long-term criminal conduct" that Congress sought to stop by passing RICO. *See GICC*, 67 F.3d at 468; *Schnell v. Conseco, Inc.*, 43 F. Supp. 2d 438 (S.D.N.Y. 1999).

**Open-ended continuity.**  Open-ended continuity requires that the criminal activity "by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. There are several ways to show open-ended continuity. "Some crimes may by their very nature include a future threat . . . When the business of an enterprise is primarily unlawful, the continuity of the enterprise itself projects criminal activity into the future." *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir.

17

2017) (citing *Spool v. World Child Intern Adoption Agency*, 520 F.3d 178, 185 (2d Cir. 2008). Criminal activity may also be continuous "when 'the predicate acts were the regular way of operating that business,' even if the business itself is primarily lawful." *Id.* (quoting *Cofacredit*, 187 F.3d at 243).

The enterprise alleged by Plaintiffs does not satisfy the requirement of threatened future criminal activity for two reasons.

First, the scheme was inherently terminable because One World's funds were destined to run out.  By the time the instant complaint was filed, Chaleplis had ceased to believe in his business partners and had long since stopped investing money with them – the last such investment took place in July 2019.  Once the stolen funds are gone, the enterprise can no longer sustain itself and the scheme ceases to exist.  *Spool v. World Child Int'l. Adoption Agency*, 520 F.3d 178, 186 (2d Cir. 2008).

Second, the enterprise was terminated when Plaintiffs either kicked Onoufriadis and his confederates out of the management of One World in April 2020 or they left voluntarily.  The entire scheme necessarily ended by April 7, 2020, when Onoufriadis resigned from One World and lost his signatory authority over its bank accounts, at which point Defendants were deprived of their ability to siphon additional funds out of the company.  Plaintiffs alleges no facts from which one could infer that he had any other business dealings with the alleged enterprise; in fact, the last money was obtained from Plaintiffs almost a year before Onoufriadis's resignation, and the last predicate act that Plaintiffs identify in their RICO Case Statement occurred in November 2018.  On those pleaded facts, it is impossible to infer any threat of ongoing criminal conduct.

Plaintiffs suggest that the lawsuits that Plaintiffs filed in Massachusetts and Greece in July 2020 to recover property from Onoufriadis and his friend Manolakos are evidence of an ongoing

threat of criminal activity. That is ridiculous. The lawsuits were part of Plaintiffs' effort to recover funds they lost as part of a fraudulent scheme that had come to an end over a year earlier. A suit instituted by Chaleplis and One World is not a fraudulent act by any of the alleged racketeers.

### 2. RICO Injury

Defendants Karloutsos and Onoufriadis also assert that Plaintiffs' claims under Sections 1962(a) and (b) of RICO should be dismissed because they failed to allege any injury distinct from the injury caused by the predicate acts alone.

To state a claim under Section 1962(a), a plaintiff must allege "injury from the defendant's investment of the racketeering income." *Ouaknine v. MacFarlane*, 897 F.2d 75, 83 (2d Cir. 1990). Similarly, to state a claim under Section 1962 (b), a plaintiff must allege an injury stemming from the "acquisition or maintenance" of the enterprise "that is distinct from the injuries resulting from predicate acts." *Discon v. Nynex Corp.*, 93 F.3d 1055, 1062-63 (2d Cir. 1996), *vacated and remanded on other grounds*, 525 U.S. 128 (1998).

In this case, Plaintiffs have not alleged any injury stemming from the "investment or use" of racketeering income or "acquisition or maintenance" of the alleged RICO enterprise. The only injury alleged by Plaintiffs as a result of Defendants' RICO violations is the theft of $9,000,000 through a series of fraudulent loans and wire transfers. (Dkt. No. 34 at 28.) In other words, this injury and the injury stemming from the predicate wire transfers are one and the same. Without a distinct "investment" or "acquisition" injury, Plaintiffs fail to state a cause of action under Sections 1962(a) or (b).

In sum, because Plaintiffs have failed to allege either continuity or any distinct RICO injury, they fail to state a claim for any substantive RICO violation. Count XIV is, therefore, dismissed.

### B.  *RICO Conspiracy*

Plaintiffs' claim for RICO conspiracy, in violation of 18 U.S.C. § 1962(d), fails because Plaintiffs have failed to state a claim for the underlying substantive RICO violations.  *Vicon Fiber Optics Corp. v. Scrivo*, 201 F. Supp. 2d 216, 221 (S.D.N.Y. 2002) (citing *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1062-63 (2d Cir. 1996), *vacated on other grounds*, 525 U.S. 128 (1998)).

Count XV is dismissed as against Karloutsos and Onoufriadis.

### C.  *Counts XIV and XV Are Also Dismissed as Against Rodgers*

Rather than file a motion to dismiss, Rodgers filed an answer to the amended complaint on October 30. (Dkt. No. 41).  Nonetheless, I also dismiss the RICO claims as against Rodgers, who is named as a RICO defendant.

"[W]hile dismissing a complaint as to a non-moving defendant is not an ordinary practice, a district court may dismiss claims *sua sponte* for failure to state a claim, at least so long as the plaintiff had notice and opportunity to be heard on the issue."  *Antidote Intern. Films, Inc. v. Bloomsbury Pub., PLC*, 467 F. Supp. 2d 394, 399 (S.D.N.Y. 2006) (quoting *First Capital Asset Mgmt. v. Brickelbush, Inc.*, 219 F. Supp. 2d 567, 580 (S.D.N.Y. 2002).

Plaintiffs in this case have filed two complaints, a RICO case statement, and have had the opportunity to respond to both Karloutsos and Onoufriadis's motions to dismiss the RICO claims.  The RICO claims against Rodgers are identical to those brought against Karloutsos and Onoufriadis and are based on the same facts and legal theories.  The RICO claims against Rodgers are legally deficient for the same reasons that they are legally deficient against the other defendants. It would be "a waste of judicial resources to allow this legally defective claim, as to which Plaintiff[s] ha[ve] been fully heard," to be pursued against Rodgers.  *Id.*

20

### D.  Leave to Amend the RICO Claims Is Denied

Plaintiffs ask that, in the event of dismissal of the RICO claims, the Court allow them to file a second amended complaint that incorporates "additional proof and evidence of [the] frauds and more [that] has been filed in the Court's record."[5]  (Dkt. No. 59 at 21.)

Leave to amend is liberally granted "when justice so requires."  Fed. R. Civ. P. 15(a)(2). The decision to grant or deny leave to amend under Rule 15(a)(2) is within the trial court's discretion.  *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971).  The court may deny leave to amend for "good reason," which involves an analysis of the four factors articulated in *Foman v. Davis*, 371 U.S. 178, 182 (1962): undue delay, bad faith, futility of amendment, or undue prejudice to the opposing party.  *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman*, 371 U.S. at 182).

Plaintiffs have not filed a proposed second amended complaint so the Court has no idea what additional allegations it would contain. However, even without seeing a proposed amended complaint, there is ample reason to deny any request for leave to amend the RICO claims.

Because civil RICO claims are disfavored, when dealing with efforts to resurrect a dismissed RICO claim, a moving plaintiff must convince the court that an amended pleading would cure the deficiencies of the claim.  The record before the court contains no such evidence.  In fact, Plaintiffs' papers cite no evidence whatsoever. Plaintiffs merely assert that there exists "additional proof and evidence" of "numerous misrepresentations and predicate acts committed by defendants." (Dkt. No. 59 at 21.)  Those misrepresentations and "predicate acts" are not identified, by fact, type, date, speaker or perpetrator.

---

[5] Although Plaintiffs have not made a motion to amend, the Second Circuit has indicated that "where a plaintiff clearly has expressed a desire to amend, a lack of a formal motion is not a sufficient ground for a district court to dismiss without leave to amend."  *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006).

Instead of providing a proposed amended pleading, Plaintiffs direct the Court to a brief they filed opposing an unrelated motion concerning a discovery dispute: Karloustos's motion to quash a subpoena that was served on his bank, Wells Fargo. (*See* Dkt. Nos. 49, 58.)  Attached to that brief are 176 pages of documents – some of which Plaintiffs collected before filing their lawsuit, and some of which they obtained as a result of this Court's order allowing discovery to proceed while the parties briefed the motions to dismiss.  Plaintiffs assert, without explanation, that those documents contain the "additional proof and evidence" referred to in their motion to amend. They do not point to where in this mass of paper that proof lies.

The court has nonetheless reviewed the attachments to the motion to quash. That review reveals nothing that would resolve the lack of either continuity or RICO injury, the failure to allege which dooms the RICO counts in the first place. Of the additional wire transfers that Plaintiffs have identified (most of them involving Manolakos, who is not a defendant in this lawsuit), only two occurred outside of the fifteen-month span during which the predicate acts that are already alleged occurred: (1) a wire transfer related to a purported loan from Manolakos to Conmave by way of Rodgers's IOLTA account on December 7, 2017, and (2) a transfer from Manolakos's personal bank account to his lawyer's for the purchase of a condo on June 20, 2019.  Even if these transfers were deemed to be predicate acts, Plaintiffs would still fall six months short of the two-year mark for closed-ended continuity.

As for open-ended continuity, Plaintiffs do not suggest that they have suddenly discovered additional investments made by One World in Defendants' schemes after July 2019. Therefore, their "new evidence" undermines neither the conclusion that the scheme was both "inherently terminable" nor the fact that it has actually terminated. The one additional transfer of funds to an alleged member of the enterprise occurred a full year before this lawsuit was brought, and it was

not the result of any new or continuing fraud, but rather the re-diversion of funds that had already been obtained, allegedly by fraudulent means. Nothing in this mass of documents contravenes the well-pleaded allegation that the entire scheme ended – was not just terminable, but was actually terminated – in April 2020. There is simply no threat of ongoing criminal activity.

Finally, nowhere in the documents appended to the motion to quash is there anything suggesting that Plaintiffs suffered an injury distinct from the injury suffered by virtue of their having been defrauded into contributing funds to an enterprise then controlled by Defendants, and the alleged theft of their money. As there is no threat of ongoing criminal activity, so there is no independent racketeering injury.

For these reasons, any amendment to reassert the RICO claims would be futile.

Plaintiffs knew, from reading the opening briefs filed by Karloutsos and Onoufriadis, that the motion to dismiss the RICO claims rested on a lack of continuity and lack of RICO injury.   It was incumbent upon them, in opposing that motion with a request to amend, to demonstrate that the proposed amendment would solve these problems. Plaintiffs have not even tried to do so.

This is not a RICO case.  It is a fraud and (arguably) a conversion case.  Leave to amend is denied. The RICO Counts, Counts XIV and XV, are dismissed as against all defendants, with prejudice and without leave to replead.

## III.    State Law Claims

Karloutsos, and only Karloutsos, has moved to dismiss the state law claims against him for failing to state a claim, pursuant to Rule 12(b)(6).  At the time he made the motion, Plaintiffs had represented to the court that complete diversity existed – which would have given this court jurisdiction over the common law claims notwithstanding dismissal of the federal RICO counts – and no defendant had suggested otherwise. The motions to dismiss were briefed on the basis that

the Court would have constitutional jurisdiction over this action whatever the fate of the RICO claims.

However, I have recently been advised that Onoufriadis, while a lawful permanent resident of the United States, is a citizen of Greece. Onoufriadis argues that, in the absence of a viable federal claim, this court lacks subject matter jurisdiction over the lawsuit.  He is correct.

Section 1332(a) provides that, "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between citizens of different states."  28 U.S.C. § 1332(a).

 "The rule of complete diversity – that no plaintiff and no defendant may be a citizen of the same state – applies to alienage cases as well as to ordinary diversity cases." *TFL CBRL LLC v. Societe Generale*, No. 20 cv. 2367 (PKC), 2020 WL 1304143, at *1 (S.D.N.Y. Mar. 17, 2020) (quoting *F. & H.R. Farman-Farmian Consulting Engineers Firm v. Harza Eng'g Co.*, 882 F.2d 281, 284 (7th Cir. 1989)).  "And, 'the presence of aliens on two sides of a case destroys diversity jurisdiction,' just like the presence of two citizens of the same state." *Id.* (quoting *Corporacion Venezolana de Formento v. Vintero Sales Corp.*, 629 F.2d 786, 790 (2d Cir. 1980)).  It does not matter that the aliens are citizens of two different countries; federal courts simply "do not have jurisdiction over lawsuits between two foreign parties," *Tagger v. Strauss Grp, Ltd*., 951 F.3d 124, 127 (2d Cir. 2020).

A lawful permanent resident domiciled in a state is not a citizen of that state – he is an alien for purposes of diversity jurisdiction. Any doubt on that score was resolved a year ago by the Second Circuit, in *Tagger.*  As a citizen of Greece, Onoufriadis is an alien – not a citizen of Massachusetts, as Plaintiffs apparently believed.  (*See* Dkt. No. 67 & Ex. A.)  His status as a lawful permanent resident does not alter that conclusion.

24

Chaleplis is also an alien; he pleads in his complaints that he is a citizen of the United Kingdom. (Dkt. No. 37 at 1.) Moreover, since Chaleplis is the sole member of the LLC One World, the corporation is an alien as well. *See Handelsman v. Bedford Vill. Assoc. Ltd. P'ship*, 213 F.3d 48, 51–52 (2d Cir. 2000) (citing *Cosgrove v. Bartolotta*, 150 F.3d 729, 731 (7th Cir. 1998)).

There are, therefore, aliens on both sides of this lawsuit – which defeats diversity.

Because the RICO claims – the only federal claims in this dispute that could provide a basis for subject matter jurisdiction pursuant to 28 U.S.C. § 1331[6] – have been dismissed and there lacks complete diversity of citizenship among the parties, the Court no longer has subject matter jurisdiction over the remaining state law claims. It could, however, elect to exercise supplemental jurisdiction over the state law claims alleged in Counts I through XIII.

When a district court has original jurisdiction over claims in a case, it "shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III. *F5 Capital v. Pappas*, 856 F.3d 61, 77 (2d Cir. 2017) (quoting 28 U.S.C. § 1367(a)); *see United Mine Workers of Am. V. Gibbs*, 383 U.S. 715, 725 (1966). Claims are considered part of the same case or controversy if they derive from a common nucleus of operative fact. *Shahriar v. Smith & Wollensky Rest. Grp. Inc.*, 659 F.3d 234, 245 (2d Cir. 2011).

At the time of the filing of this lawsuit, the Court unquestionably had original jurisdiction, since the complaint included claims asserted under the federal RICO statute. The non-federal claims asserted by Plaintiffs arise out of the same facts as the deficient RICO claims. Therefore,

---

[6] In their October 30 letter explaining the basis for federal jurisdiction over this case, Plaintiffs asserted that the Court also has jurisdiction arising from the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.* However, the Declaratory Judgment Act does not confer jurisdiction on a federal court. *Saleh v. Ridge*, 367 F. Supp. 2d 508, 511 (S.D.N.Y. 2005).

in appropriate circumstances, it would be within my discretion to retain supplemental jurisdiction over the remaining non-federal claims.

However, even when claims satisfy the "same case or controversy test," Section1367(c) permits a court to decline to exercise supplemental jurisdiction if, among other things, "the district court has dismissed all claims over which it has original jurisdiction."  18 U.S.C. § 1367(c)(3).  Once a district court's discretion is triggered by Section 13367(c), it may decline to exercise supplemental jurisdiction when doing so would fail promote the four values that the Supreme Court articulated in *Gibbs*, 383 U.S. at 726: economy, convenience, fairness, and comity."  *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004).  In weighing those factors, district courts are aided by the Supreme Court's additional guidance that "in the usual case in which all federal-law claims are eliminate before trial, the balance of factors . . . will point toward declining jurisdiction over the remaining state-law claims."  *In re Merrill Lunch Ltd. Partnerships Litig.*, 154 F.3d 56, 61 (2d Cir. 1988) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).  The Second Circuit takes a particularly strong view that district courts should decline to exercise supplemental jurisdiction in the absence of a "clearly articulated federal interest."  *See Kolari v. N. Y. Presbyterian Hosp.*, 455 F.3d 118, 123 (2d Cir. 2006); *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 405 (2d Cir. 2017) (Calabresi, J., concurring).

This is the usual case, and not one in which this Court would choose to exercise supplemental jurisdiction.  The first complaint was filed just six months ago. Aside from deciding the motions to dismiss the RICO claims, this Court has done nothing with respect to the matter. The Southern District of New York has nothing to do with the parties (none of whom lives or works here) or the allegedly fraudulent business ventures (which are located in Greece and Massachusetts).  The only link to New York is the fact that a couple of meetings allegedly took

place here.  This Court lacks any interest in continuing to preside over the resolution of these out-of-state and out-of-country matters.  Rather, resolution of the state-law claims in state court will avoid "needless decisions of state law" by this Court.  *Gibbs*, 383 U.S. at 726.  The fact that Rodgers filed an answer and that there has been a modicum of discovery over the past couple of months does not persuade me otherwise; that discovery will presumably not go to waste if and when this lawsuit is filed in a court of competent jurisdiction – which this Court is not.

Having considered the factors set forth in *Gibbs*, the Court declines to exercise supplemental jurisdiction over Counts I through XIII and dismisses them as against all defendants without prejudice.  I specifically decline to grapple with Karloutsos' motion to dismiss the common law claims; it is denied without prejudice as moot.

I cannot say that I am pleased about the timing of Onoufriadis's revelation. Onoufriadis presumably knew on the day he was sued that he was a Greek citizen, and while he is a resident alien, *Tagger* had been on the books for many months by last summer. Onoufriadis had two pre-motion opportunities to alert the Court to the fact that diversity was lacking – in response to the October 30 letter filed by Plaintiffs' counsel, and again at the initial pretrial conference, when the Court raised the question. He did not point out Plaintiffs' error. Onoufriadis also did not contest diversity in response to Karloutsos' motion to dismiss the common law claims asserted against him, though that was an obvious time to urge the court not to exercise supplemental jurisdiction. Instead, Onoufriadis waited until January 15, 2021 – two and a half months after Plaintiffs first filed their letter setting forth the basis for this Court's subject matter jurisdiction over the state law claims – to submit a letter alerting the Court to his Greek citizenship and discussing the jurisdictional implications of that fact.  I find this difficult to explain. The rules governing diversity

jurisdiction are supposed to be known by all parties, and the Court had expressed an interest in the basis for asserting diversity.

## CONCLUSION

For the reasons stated above, Counts XIV and XV of the First Amended Complaint are dismissed with prejudice and without leave to replead as against all defendants, and the remainder of the complaint is dismissed without prejudice to the claims' being refiled in a court of competent jurisdiction.

The Clerk of the Court is directed to remove the motions at Docket Nos. 39 and 47 from the Court's list of pending motions and to close this case.

Dated: January 19, 2021

_____

Chief Judge


BY ECF TO ALL COUNSEL